UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**DEVIN PERKINS**                                        **CIVIL ACTION**

**VERSUS**                                               **NO. 19-10240**

**ROBERT TANNER**                                        **SECTION: "S"(1)**

### REPORT AND RECOMMENDATION

Petitioner, Devin Perkins, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that his application be **DISMISSED WITH PREJUDICE**.

On December 2, 2016, petitioner pleaded guilty to manslaughter under Louisiana law and was sentenced to a term of twenty-two years imprisonment.[1] He did not file a direct appeal.[2]

On November 18, 2017, petitioner filed an application for post-conviction relief with the state district court.[3] That application was denied on November 29, 2017.[4] His related writ applications were thereafter likewise denied by the Louisiana Fourth Circuit Court of Appeal on January 12, 2018,[5] and the Louisiana Supreme Court on April 22, 2019.[6]

---

[1] State Rec., Vol. 1 of 3, transcript of December 2, 2016; State Rec., Vol. 1 of 3, minute entry dated December 2, 2016; State Rec., Vol. 1 of 3, guilty plea form.
[2] See Rec. Doc. 1, p. 2, answer to Question No. 8.
[3] State Rec., Vol. 1 of 3. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Here, petitioner states that he deposited his post-conviction application in the prison mailbox on November 18, 2017, see Rec. Doc. 18, p. 2, and respondent has offered no evidence to the contrary. Further, petitioner's statement is credible, given that he signed the application on November 17, 2017, and it was received and filed by the state district court on November 22, 2017.
[4] State Rec., Vol. 1 of 3, Judgment dated November 29, 2017.
[5] State v. Perkins, No. 2017-K-1034 (La. App. 4th Cir. Jan. 12, 2018); State Rec., Vol. 3 of 3.
[6] State v. Perkins, 267 So. 3d 589 (La. 2019); State Rec., Vol. 3 of 3.

On May 6, 2019, petitioner then filed the instant federal application seeking habeas corpus relief.[7] Respondent filed an answer conceding that petitioner's claims were exhausted and not procedurally defaulted;[8] however, respondent argued that petitioner's application was untimely.[9] Petitioner filed a reply arguing that respondent's calculations regarding the statute of limitations were incorrect.[10]

## I. Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a statute of limitations applicable to federal habeas corpus proceedings. Specifically, the AEDPA provided:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

---

[7] Rec. Doc. 1. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner declared under penalty of perjury that his application was placed in the prison mailing system on May 6, 2019. Rec. Doc. 1, p. 10. Respondent offered no evidence to the contrary.
[8] Rec. Doc. 15, pp. 6-7.
[9] Id. at pp. 7-11.
[10] Rec. Doc. 18.

28 U.S.C. § 2244(d)(1).

The parties agreed that § 2244(d)(1)(A) was the subsection applicable in the instant case; however, they disagreed on when petitioner's state criminal judgment "became final" under that subsection. In his answer, respondent argued that petitioner's state criminal judgment became final on December 2, 2016, i.e. the same day he entered his guilty plea and was sentenced.[11] In his reply, petitioner argued that the judgment did not become final until later, when his period for seeking direct review expired.[12]

Respondent simply stated his argument as a given fact without supplying any underlying rationale or citation to authority. However, the Court assumes that his argument *may* be that petitioner's state criminal judgment became final immediately because he had no right to direct review. If that is indeed respondent's argument, the Court rejects it for the following reasons.

As an initial matter, it is true that petitioner entered an unconditional guilty plea and was sentenced in accordance with the terms of a plea bargain. Those two factors would appear to support an argument of immediate finality.

For example, the Louisiana Supreme Court has held:

> In criminal proceedings, final judgments are appealable, La.C.Cr.P. art. 912 A, and the defendant has a statutory right to appeal a judgment which imposes a sentence upon him, La.C.Cr.P. art. 912 C. A sentence may be based either upon a verdict or a plea of guilty. La.C.Cr.P. art. 872(3). Unless waived by the appellant, an error properly reserved by an assignment of error 'shall be considered on appeal.' La.C.Cr.P. art. 920.
> ….
> Nevertheless, by judicially-created principle, a defendant normally waives any non-jurisdictional error by his plea of guilty. Under both state and federal jurisprudence, an *unqualified* plea of guilty waives all non-jurisdictional defects occurring prior thereto, and precludes review thereof either by appeal or by post-conviction remedy.

---

[11] Rec. Doc. 15, p. 9.
[12] Rec. Doc. 18, p. 1.

State v. Crosby, 338 So. 2d 584, 588 (La. 1976). Of course, in Crosby, the Louisiana Supreme Court also held that a defendant could preserve his appellate rights if he expressly conditioned his guilty plea upon such a reservation of rights, and if the trial court accepted the plea so conditioned. However, in the instant case, petitioner's plea was entered unconditionally.

In addition, Louisiana law also expressly provides: "The defendant cannot appeal or seek review of a sentence imposed in conformity with a plea agreement which was set forth in the record at the time of the plea." La. Code Crim. P. art. 881.2(A)(2). See also State v. Young, 680 So.2d 1171 (La. 1996) (holding that article 881.2(A)(2) precludes a defendant from appealing a sentence imposed in conformity with a plea agreement regardless of whether the agreement involved a specific sentence or a sentencing cap). In the instant case, the court imposed the sentence agreed upon in the plea bargain.

All that being said, it is likewise clear that a guilty plea does *not* preclude a defendant from appealing *jurisdictional* defects. As the Louisiana Supreme Court explained in Crosby:

> [E]ven an *un*qualified plea of guilty does not preclude review of what are regarded as "jurisdictional" defects – those which, even conceding the accused's factual guilt, do not permit his conviction of the offense charged. These include, for example: the lack of jurisdiction of the sentencing court, La.C.Cr.P. art. 362(1); the conviction represents double jeopardy, La.C.Cr.P. art. 362(2), State *ex rel.* Wikberg v. Henderson, 292 So.2d 505 (La. 1974); Menna v. New York, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975); the prosecution, when instituted, had prescribed, La.C.Cr.P. art. 362(7), see also State *ex rel.* Williams v. Henderson, 289 So.2d 74 (La. 1974); the state lacked constitutional or legal power to try the accused for the offense charged, Blackledge v. Perry, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); State *ex rel.* Jackson v. Henderson, 283 So.2d 210 (La. 1973); the statute under which the prosecution is brought is unconstitutional, State v. Bergeron, 152 La. 38, 92 So. 726 (1922); the charge brought by the indictment does not constitute a crime, State v. Watson, 41 La. Ann. 598, 7 So. 125 (1889); certain types of patent error preventing conviction for the offense, La.C.Cr.P. art. 920(2), see indicative listing at State v. Guillot, 200 La. 935, 9 So.2d 235, 239 (1942).

Crosby, 388 So. 2d at 588.

4

Because respondent has not argued that petitioner validly waived his right to file an appeal concerning a *jurisdictional* defect in his case, the Court will assume that petitioner retained that right. Accordingly, the Court finds that petitioner's state criminal judgment was not "final" for AEDPA purposes until his time for filing such an appeal expired. See Roberts v. Cockrell, 319 F. 3d 690, 694 (5th Cir. 2003); see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (observing that § 2244(d)(1)(a) "supplies two alternate methods under which a conviction can become final: direct review can end or the time to pursue the direct review can expire").

Having accepted petitioner's argument on this issue, the Court must next determine when his time for filing such an appeal expired. On that point, the United States Fifth Circuit Court of Appeals has held:

> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (citation omitted). In the instant case, the Court therefore looks to Louisiana law, which provides a thirty-day period for seeking appellate review. See La. Code Crim. P. art. 914(B)(1) ("The motion for an appeal must be made no later than … [t]hirty days after the rendition of the judgment or ruling from which the appeal is taken.").

Accordingly, because petitioner entered his guilty plea and was sentenced on December 2, 2016, his state criminal judgment became final – and his AEDPA limitations period therefore commenced – on January 3, 2017.[13]

---

[13] The Court recognizes that the thirtieth day of that period actually fell on January 1, 2017. However, because that was a Sunday and the following day was a legal holiday (the observation of New Year's Day), petitioner had until Tuesday, January 3, 2017, to file an appeal. See La. Code Crim. P. art. 13; La. Rev. Stat. Ann. § 1:55.

The limitations period then ran uninterrupted for three hundred eighteen (318) days, until petitioner filed his application for post-conviction relief with the state district court on November 18, 2017. Further, once he filed that application, it remained "pending" for the purposes of § 2244(d)(2) for the duration of the post-conviction proceedings, so long as he sought review at the higher levels of the state court system in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). Here, although the state district court denied petitioner's application for post-conviction relief, he sought review of that judgment by the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court. Respondent does not argue that those supervisory writs were untimely filed. Accordingly, the Court finds that petitioner's post-conviction application remained pending – and the limitations period remained tolled – until April 22, 2019, the date on which the Louisiana Supreme Court denied relief.[14]

When the limitation period then resumed running, petitioner had forty-seven (47) days remaining. Because he filed his federal application a mere fourteen (14) days later on May 6, 2019, the application was timely filed.[15]

## II. Standards of Review

In addition to establishing the foregoing statute of limitations, the AEDPA also "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155

---

[14] A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief. Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

[15] Out of an abundance of caution, the Court notes that even if it were inclined to adopt respondent's argument that petitioner's state criminal judgment became final immediately on December 2, 2017, i.e. the date he entered his plea and was sentenced, his federal application would still be timely filed. Although respondent concluded otherwise, he miscalculated by failing to take into account the applicable "mailbox rules" for determining the filing dates of petitioner's state post-conviction application and federal habeas corpus application. See *supra* notes 3 and 7.

(5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court). The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at

8

> hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

### III. Petitioner's Claims

In his federal application, petitioner asserts two claims alleging that he was denied the effective assistance of counsel. Specifically, he claims that his counsel failed to investigate the case before advising him to plead guilty, alleging:

> The incident occurred at the 2200 block of Galves [sic] Street on June 11, 2014. Public Defender, Carrie E. Ellis failed to investigate the camera on Elysian Fields and Galves [sic] Street of the corner store. The camera would have proven that Petitioner and Lamont Jones were present, but Lamont Jones was the shooter. He advised the attorney of the camera, but she never investigated into the matter.[16]

He also claims that his attorney "coerced" him into pleading guilty, alleging:

> Public Defender, Carrie E. Ellis advised Petitioner that she didn't think he should risk getting a life sentence because she had never won in trial and doubt she will win this one. Jontrell (Petitioner's girlfriend) had sex with the deceased in exchanged for drugs. Counsel informed Petitioner that it doesn't look good because

---

[16] Rec. Doc. 1, p. 6.

he had a motive to commit the crime. Petitioner kept advising her that the camera will show that Lamont Jones was the shooter. She ignored his comments and continued to persuade him to plead guilty.[17]

In the post-conviction proceedings, the state district court rejected those claims, holding:

Petitioner asserts that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution. Specifically, Petitioner argues that trial counsel failed to investigate and interview witnesses. In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result". Id. at 699. In particular, the defendant must show that his representation fell below an objective standard of reasonableness *and* that but for counsel's errors, the result(s) of the trial would have been different. Id. Further, it is unnecessary to address the issues of both counsel's performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components. State v. Serigny, 610 So.2d 857, 859-60 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1263 (La. 1993). Here, Petitioner's allegation is insufficient to support a claim that he was prejudiced by any conduct by his counsel. State v. Camp, 46,052 (La.App. 2 Cir. 3/16/11), 59 So.3d 548, writ denied, 11-954 (La. 12/16/11), 76 So.3d 199. Petitioner offers no proof that his trial counsel failed to adequately investigate and question the witnesses. Moreover, Petitioner fails to show that counsel's representation fell below an objective standard of reasonableness or but for counsel's errors, the end result would have been different. Accordingly, this claim is without merit.

     Next, Petitioner asserts that he was lead [sic] to enter an involuntary and invalid guilty plea. Specifically, Petitioner avers that he was coerced to plead guilty because the only choices he had was [sic] to either go to trial and be subjected to life imprisonment or accept a twenty-two year plea agreement. A review of the record shows that on December 2, 2016, Petitioner, his attorney, and this Court properly executed a waiver of guilty plea form that enumerated the petitioner's rights and indicated the sentence he wold receive in accordance with the plea agreement. Additionally, during the guilty plea colloquy, this Court advised Petitioner of the right to a jury trial, the right of confrontation, and the privilege against self-incrimination, as required by Boykin. This Court also explained to Petitioner the offense with which he was charged and the sentencing range for that offense. Petitioner acknowledged that he understood those rights, and was not acting under threats or coercion and wished to waive his rights and enter a plea of guilty. Thus, Petitioner was carefully informed of his rights and the consequences of his plea, and his plea was entered into knowingly and voluntarily. Furthermore, there is nothing in the record to support a claim that Petitioner was misled and there

---

[17] Id. at p. 5. Although petitioner refers to this as a "due process" violation, it is in fact an ineffective assistance of counsel claim.

10

is no indication that his plea was coerced. Accordingly, this claim is without merit.[18]

The Louisiana Fourth Circuit Court of Appeal then denied petitioner's related writ application, noting: "Relator derived considerable benefit as a result of his guilty plea and makes no convincing showing of actual innocence or the deprivation of constitutional rights."[19] The Louisiana Supreme Court thereafter likewise denied relief, holding: "Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to his remaining claims, applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[20]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the

---

[18] State Rec., Vol. 1 of 3, Judgment dated November 29, 2017, pp. 1-2.
[19] State v. Perkins, No. 2017-K-1034 (La. App. 4th Cir. Jan. 12, 2018); State Rec., Vol. 3 of 3.
[20] State v. Perkins, 267 So. 3d 589 (La. 2019); State Rec., Vol. 3 of 3.

> state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so*. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (emphasis added; citations omitted). Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential

12

standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

The United States Fifth Circuit Court of Appeals has held: "[O]nce a guilty plea has been entered, all nonjurisdictional defects in the proceedings against a defendant are waived. This includes all claims of ineffective assistance of counsel, *except* insofar as the alleged ineffectiveness relates to the voluntariness of the giving of the guilty plea." Smith v. Estelle, 711 F.2d 677, 682 (5th Cir. 1983) (citations omitted). Petitioner's claims fall within that exception, because he is essentially arguing that his counsel's assistance was so deficient that petitioner had no choice but to plead guilty against his will.

As the state courts correctly held, the clearly established federal law with respect to such ineffective assistance of counsel claims was set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). For relief to be granted on such claims, Strickland requires that a petitioner show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Id. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct

of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to satisfy the prejudice prong of an ineffective assistance of counsel claim in a case involving a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); accord James v. Cain, 56 F.3d 662, 667 (5th Cir. 1995).

For the following reasons, the Court finds that petitioner's claims fail on both prongs of the Strickland analysis.

As to the first prong, petitioner alleges that his counsel performed deficiently in failing to adequately investigate the case and in advising him to plead guilty.

With respect to counsel's investigation, this Court first notes that petitioner has never offered any evidence as to what steps counsel took or failed to take in investigating the case. Without such evidence, he cannot show that counsel performed deficiently in that respect. Netter v. Cain, Civ. Action No. 15-584, 2016 WL 7157028, at *11 (E.D. La. Oct. 6, 2016), adopted, 2016 WL 7116070 (E.D. La. Dec. 7, 2016).

Further, in any event, he has produced no evidence showing that additional investigation would have actually revealed information beneficial to the defense. Although he suggests that counsel should have investigated the surveillance footage from a corner store near where the shooting occurred, he has presented no evidence that the store had surveillance cameras, that those cameras recorded the crime, and that the recording would have exonerated him. "[A] court cannot assume or presume the existence of the video or its contents." Briley v. Kent, Civ. Action No. 18-10620, 2019 WL 3230865, at *9 (E.D. La. June 11, 2019), adopted, 2019 WL 3220119 (E.D. La. July 17, 2019). Petitioner's suggestion that such a recording of the crime existed and would have

14

exonerated him is purely speculative and clearly insufficient to warrant relief. See, e.g., Hartshorn v. Prince, Civ. Action No. 12-1359, 2012 WL 3860469, at *7 (E.D. La. July 30, 2012), adopted, 2012 WL 3862352 (E.D. La. Sept. 5, 2012); Kron v. Tanner, Civ. Action No. 09-7572, 2010 WL 3470465, at *2 (E.D. La. Aug. 30, 2010).

With respect to counsel's advice that petitioner plead guilty to avoid risking a life sentence, that advice was sound for the following reasons.

In the indictment, petitioner was originally charged with second degree murder.[21] Under Louisiana law, "[s]econd degree murder is the killing of a human being … [w]hen the offender has a specific intent to kill or to inflict great bodily harm …." La. Rev. Stat. Ann. § 14:30.1(A)(1). "Specific intent to kill or inflict great bodily harm may be inferred from the circumstances of the offense, the extent and severity of the victim's injuries, or the defendant's actions in deliberately pointing a gun and firing it at a person." State v. Sanders, 273 So. 3d 635, 647 (La. App. 2d Cir. 2019).

Petitioner admits that he was present when the victim was shot and that he had a motive to kill the victim, namely that victim had engaged in sexual relations with petitioner's girlfriend in exchange for drugs. Further, in giving the factual basis for the plea during the colloquy, the prosecutor stated: "On June 11th, 2014, the defendant was present at 2231 North Galvez, along with several other members who were outside the residence. The defendant, Devin Perkins, was identified by two eyewitnesses as having committed the homicide of Jermaine Milton on that evening at approximately 9:00 p.m."[22] Petitioner admitted those facts.[23] In addition, although he now contends that Milton was actually killed by Lamont Jones, petitioner has produced no

---

[21] See State Rec., Vol. 1 of 3, Indictment.
[22] State Rec., Vol. 1 of 3, transcript of December 2, 2016, p. 8.
[23] Id. at p. 9.

evidence in support of that contention, as well as no evidence showing that Jones was not acting in concert with petitioner.[24] In light of all of those considerations, counsel was correct in concluding that there was a good chance petitioner would be convicted of second degree murder at trial.

Moreover, if convicted of second degree murder at trial, petitioner faced a mandatory sentence of life imprisonment without benefit of parole, probation, or suspension on sentence. La. Rev. Stat. Ann. § 14:30.1(B). The severity of that sentence cannot be overstated. As the United States Supreme Court has observed:

> It is true that a death sentence is "unique in its severity and irrevocability," Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency – the remote possibility of which does not mitigate the harshness of the sentence. Solem, 463 U.S., at 300-301, 103 S.Ct. 3001. As one court observed in overturning a life without parole sentence for a juvenile defendant, this sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." Naovarath v. State, 105 Nev. 525, 526, 779 P.2d 944 (1989).

Graham v. Florida, 560 U.S. 48, 69-70 (2010). Similarly, one scholar has opined:

> At least in jurisdictions without generous early release provisions, life sentences are practically akin to "death-in-prison sentences" or necessarily beget "death by

---

[24] If Jones and petitioner were acting in concert, both are culpable, regardless of who fired the fatal shot. Louisiana law provides:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

La. Rev. Stat. Ann. § 14:24. Therefore, under the Louisiana law of principals, all persons involved in the commission of a crime are equally culpable, and it is of no consequence which of the perpetrators fired the shot that killed the victim. See, e.g., Washington v. Tanner, Civ. Action No. 13-6120, 2015 WL 13227943, at *14 (E.D. La. Dec. 11, 2015), adopted, 2016 WL 1253564 (E.D. La. Mar. 31, 2016); State v. Massey, 91 So. 3d 453, 463-64 (La. App. 5th Cir. 2012); State v. Page, 28 So. 3d 442, 449-50 (La. App. 5th Cir. 2009).

> incarceration." A "life term" is a cultural artifact, signifying the recipient's penal servitude until the end of his natural life. In other words, the State is thereby proactively and physically condemning the individual to die within prison walls. One author posits a life sentence is merely "a semantically disguised sentence of death." For the foregoing reasons, the availability of a life sentence has been referred to as the "new death penalty" or the "other death penalty."
>
> Alternatively, commentators have contended that life sentences can be *more* punitive than capital punishment, while receiving far fewer substantive and procedural protections. Professor Berry reasonably notes how a life sentence may be *experienced* by prisoners as extra brutal: "A death sentence has an end date, which for some may be less traumatic than imprisonment until one dies of natural causes. To the extent that living in prison constitutes suffering, life without parole allows for greater suffering, or at least a longer time for suffering." Compared to capital cases, cases resulting in life sentences are procedurally less likely to necessitate individualized attention to the offender's own characteristics, receive careful and extensive review, enjoy lengthy appellate processes, or be reversed.

Melissa Hamilton, Some Facts About Life: The Law, Theory, and Practice of Life Sentences, 20 Lewis & Clark L. Rev. 803, 813-14 (2016) (footnotes omitted).

In light of the high probability that a jury would have convicted petitioner of second degree murder at trial and, if so, that the mandatory sentence of life imprisonment without parole would have been imposed, the Court finds that counsel did not perform deficiently in advising petitioner to plead guilty to a lesser charge of manslaughter in order to receive a sentence of only twenty-two years.

Petitioner's claims also fail on the prejudice prong of the Strickland analysis. As already noted, in cases such as this involving a guilty plea, a petitioner, in order to prove prejudice, "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); accord James v. Cain, 56 F.3d 662, 667 (5th Cir. 1995). Here, petitioner does not even allege – much less show – that he would not have pleaded guilty but for his counsel's purportedly deficient performance.

Further, if he makes such an allegation in any objections he files to this Report and Recommendation, the Court is not required to accept such self-serving statements as true. See Lee v. United States, 137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."); Hartshorn v. Prince, Civ. Action No. 12-1359, 2012 WL 3860469, at *9 (E.D. La. July 30, 2012) ("[D]espite his self-serving allegations to the contrary, the Court finds that it is not reasonably probable that petitioner would have rejected this extremely generous plea agreement. As a result, he has not established the prejudice required to support his claim."), adopted, 2012 WL 3862352 (E.D. La. Sept. 5, 2012). For the following reasons, any bare assertions by petitioner that he would not have pleaded guilty but for his counsel's performance would not alone suffice to meet his burden of proof considering the totality of the circumstances.

As already explained, there is no reason to doubt that petitioner would have been convicted of second degree murder at trial and, if so, would have received the mandatory sentence of life imprisonment without parole. Fortunately, petitioner had another option: a generous plea bargain offered by the state. Specifically, in exchange for his pleading guilty, the state agreed (1) to reduce the most serious charge, second degree murder, to manslaughter, (2) to drastically reduce petitioner's sentencing exposure, and (3) to *nolle pros* a second charge of attempted first degree murder.[25] By accepting the plea bargain, petitioner was guaranteed that he would serve no more than twenty-two years in prison. Although that term of imprisonment was still daunting, it paled in comparison to the sentencing exposure he faced on the original charges.

---

[25] See State Rec., Vol. 1 of 3, transcript of December 2, 2016, p. 2.

In light of those considerations, the Court finds that there is no reasonable probability petitioner would have declined the generous plea bargain and insisted on going to trial. Therefore, he cannot establish that he was prejudiced by counsel's performance.

Lastly, the Court notes that petitioner's negotiated plea was not "coerced" or otherwise involuntary simply because it was motivated by his "desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." Brady v. United States, 397 U.S. 742, 751 (1970). As the United States Supreme Court has noted:

> The plea bargaining process necessarily exerts pressure on defendants to plead guilty and to abandon a series of fundamental rights, but we have repeatedly held that the government may encourage a guilty plea by offering substantial benefits in return for the plea. While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices is an inevitable – and permissible – attribute of any legitimate system which tolerates and encourages the negotiation of pleas.

United States v. Mezzanatto, 513 U.S. 196, 209-10 (1995) (citations, quotation marks, and brackets omitted). Here, the fact that petitioner was not particularly enamored of the choices available to him is of no moment, and it in no way rendered his choice illusory or his plea coerced or involuntary.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

19

## RECOMMENDATION

It is therefore **RECOMMENDED** the federal application seeking habeas corpus relief filed by Devin Perkins be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this thirtieth day of April, 2020.

*[signature]*

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**